(265 P.3d 585)
No. 105,598

STATE OF KANSAS, *Appellee*, v. JENNIFER A. JOHNSON, *Appellant*.

Opinion filed November 18, 2011.

*David P. Troup* and *Ryan W. Rosauer*, of Weary Davis, L.C., of Junction City, for appellant.

*Richard E. James*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before Green, P.J., Malone and McAnany, JJ.

Malone, J.: Jennifer A. Johnson appeals her conviction of one count of aggravated battery. Johnson claims the district court erred in instructing the jury. Specifically, she claims the district court erred by denying her request to instruct the jury on the lesser included offenses of intentional and reckless aggravated battery. She also claims the district court erred by failing to instruct the jury on the defense of voluntary intoxication. Next, Johnson claims there was insufficient evidence to support her conviction of aggravated battery by aiding and abetting. In this regard, Johnson claims the aiding and abetting statute sets forth alternative means to commit a crime, and the State failed to provide sufficient evidence to support each alternative means. We reject each of Johnson's claims and affirm the district court's judgment.

This appeal arises from events that occurred on March 11 and 12, 2010, in which the victim, Michael Holcom, was struck by Johnson and was later beaten in his home by Andrew "A.J." Haught, allegedly at Johnson's request. On April 1, 2010, Johnson was charged with misdemeanor battery and aggravated battery by aiding and abetting. A jury trial commenced on October 14, 2010. We will summarize the conflicting testimony.

*Testimony of Darci Drake*

At trial, the State presented the testimony of Darci Drake. Drake testified that in the month prior to the events at issue, she and Johnson had become close friends. On March 11, 2010, Drake had gone to work with Johnson to try out a potential job at the company where Johnson was employed. After work, Drake and Johnson stopped at a bar in Milford, Kansas, and stayed for several hours. At the bar, Johnson met two men, later identified as brothers A.J. Haught and Chad Haught, and she introduced the men to Drake. Drake's boyfriend, Andy Didas, also joined Drake and Johnson at the bar. The entire group—Drake, Johnson, Didas, and the Haught brothers—eventually went over to Drake's house. Because Drake was too intoxicated to drive, Johnson picked up Drake's two children and brought them over to the house. Drake testified that

Johnson did not appear to be drunk, and she was oriented to her surroundings.

Drake testified that at some point, Johnson left the house to spend the night with Holcom. When Johnson left Drake's house, she did not seem upset. However, Johnson returned to Drake's house a short time later. Drake testified that Johnson was very upset and asked to park in Drake's garage because she did not want Holcom to know her location. Johnson told Drake that she had discovered Holcom had been text messaging with Lacey Deters, another woman he had been seeing. Johnson stated that she had argued with Holcom about the text messages, and she had struck Holcom during the argument. Didas and the Haught brothers were also present during this conversation. Drake eventually suggested to Didas that he go speak to Holcom to get Holcom's side of the story. Johnson gave Didas directions to Holcom's house, including the street address, the side door off the garage to use to enter the house, and the location of Holcom's room within the house where he would be located. Didas and the Haught brothers then left Drake's house. While the men were gone, Drake testified that Johnson "stared blankly at the floor and said, 'They're gonna hurt him.' "

Drake testified that the men returned approximately 30 to 45 minutes later. Didas was upset and yelling, "I can't believe you did it. I can't believe you did that." Drake noticed blood on the hands of one of the Haught brothers. At that point, Johnson wanted to go home, but Drake suggested everyone should stay because they had been drinking. Johnson stated that she had no clean clothes to wear to work in the morning, so Drake offered to wash Johnson's clothes that night. Drake thought that Johnson's insistence on clean clothes for work seemed strange, as she knew that Johnson often would spend the night away from home and go straight to work the following morning. In any event, Drake washed Johnson's clothes as well as one of the Haught brother's clothes and some of her own laundry. Everyone spent the night at Drake's house. When Drake awoke the next morning, Johnson and the Haught brothers were gone.

*Testimony of A.J. Haught*

A.J. Haught testified that after work on March 11, 2010, he went to a bar with his brother for a few drinks. He and his brother met Johnson at the bar and were invited back to Drake's house by Johnson and Didas. A.J. was interested in Johnson and thus accepted the invitation. He testified that at some point during the evening, Johnson left Drake's house and came back a short time later. Johnson was crying and saying that her boyfriend was cheating on her and that he had hit her. A.J. testified that he, his brother, and Didas went over to Holcom's house after Drake and Johnson had asked them to do so. He testified that Drake wanted them to talk to Holcom, but Johnson said, "No, I want you to take care of it for me." A.J. testified that he took Johnson's statement to mean that she wanted the men to beat up Holcom. According to A.J., Drake began to give directions to Holcom's house, but Johnson gave more specific directions, including the street address, landmarks, which door to use to enter the house, which door within the house led to Holcom's room, and where in Holcom's room the light switch was located.

Before leaving Drake's house, Didas handed A.J. a hammer and said, "Here, let's fuck him up." However, A.J. stated that they would not need a hammer, and he threw the hammer into his own vehicle. Didas then drove the men over to Holcom's house. His brother, Chad, stayed in the truck while A.J. and Didas entered Holcom's room as Johnson had directed. A.J. asked Holcom if he was "fuckin' with our girl [Johnson]" and then hit Holcom multiple times. A.J. had blood all over his hands and shirt. The men returned to Drake's house, and Johnson asked him what had happened. A.J. told Johnson that they "took care of it." Johnson, who was still crying, gave A.J. a hug and thanked him. A.J. then asked Johnson to have dinner with him some time and she agreed. At some point, A.J.'s bloody sweatshirt was washed along with some of Drake's clothing. A.J. and his brother spent the night at Drake's house and then left by 7 in the morning. A.J. admitted that, even though he had never met Holcom prior to that night, he had beaten Holcom because he thought Johnson wanted him to do so. A.J. testified that he did not intend to cause severe damage to Holcom.

## Testimony of Johnny Richardson

Johnny Richardson, Holcom's friend and Deters' fianc, testified that he had asked Holcom to come over to his house on the evening of March 11, 2010, to discuss the relationship between Holcom and Deters. Richardson testified that he and Holcom "cleared things up," had a few drinks, and parted amicably. Richardson understood the relationship between Holcom and Deters to be over. Richardson also testified that he had been in contact with Johnson concerning the relationship between Holcom and Deters, and that at one point during the weeks prior to the events in question, Johnson had said she was going to "put . . . somebody in a coffin over this deal and her dad was going to back her a hundred percent." Around 11:16 p.m. on March 11, 2010, Richardson received a message on his home answering machine from Johnson, stating that Deters and Holcom were still texting each other and that Deters had been lying to Richardson. Around 11:39 p.m. and 11:43 p.m., Richardson received two text messages from Johnson, again stating that Deters and Holcom were still texting and "that whore will die."

## Testimony of Michael Holcom

Holcom testified that after work on March 11, 2010, he had gone to a bar and then to Richardson's house to discuss his relationship with Deters. Holcom and Richardson parted on good terms, and Holcom went back to his own house. Holcom also testified about his relationship with Johnson. He and Johnson had been in a romantic relationship that had ended in June 2009 and had thereafter become, according to Holcom, a casual sexual relationship. However, he believed Johnson took this relationship seriously and was "a little obsessed about it." On the evening of March 11, 2010, he and Deters exchanged a series of text messages in which Holcom called Johnson "crazy" and stated that she "manipulates" things. That same evening, Holcom also exchanged a series of text messages with Johnson regarding whether she would spend the night with him. Holcom testified that he did not care whether Johnson came over and that he neither encouraged nor discouraged Johnson from coming to his house.

Holcom went to sleep and woke up with Johnson sitting next to him on his bed. Johnson said something about how Holcom and Deters had been texting, and Holcom testified that Johnson punched him in the forehead and cheek. Holcom yelled at Johnson to get out and followed her out of the house. As Johnson was leaving, she told Holcom he "better watch [himself] and watch [his] truck." Holcom went upstairs to clean off some blood, then went back to bed. Holcom and Johnson exchanged several more angry text messages until about 11:40 p.m. and then Holcom fell back asleep.

Holcom next woke up to the sound of a man's voice in his room saying something about "messing with [Johnson]." Holcom testified that somebody hit him multiple times while he was still in bed. Once the people left, Holcom went to the bathroom to try to see his injuries, but he was having trouble seeing. He called out to his roommates, who found him and took him to the hospital. As a result of his injuries, Holcom had surgery, received a scar, suffered nerve damage to his teeth, and has difficulty opening his mouth. He also has a broken bone in his face which will require additional surgery to repair.

### Testimony of Dr. Mark Bell

Dr. Mark Bell also testified as to Holcom's injuries. He testified that Holcom suffered extensive facial injuries involving both cheekbones and the upper jaw. Holcom's left cheekbone was broken in several places, and his upper jaw was totally disassociated from the rest of his face. Holcom underwent surgery to repair these injuries, which involved affixing titanium plates to realign bone fragments and wiring his upper jaw to his lower teeth. A second surgery, which Holcom had refused, would be required to fix persisting cosmetic deformities in his left cheekbone and nose. Bell characterized Holcom's injuries as "in the top five worst facial injuries I've ever seen, including car wrecks and other types of massive trauma," in his 30 years of medical practice.

*Testimony of Jennifer Johnson*

Following the close of the State's evidence, Johnson testified on her own behalf. She testified that at the time of the events in question, she and Holcom were involved in a serious relationship. Holcom had told Johnson of his relationship with Deters several weeks prior. Johnson believed Holcom to be remorseful about that relationship and understood that it had ended. On the night of March 11, 2010, she exchanged a series of text messages with Holcom which she understood to be an invitation to go over to his house. She went to his house, entered through the front door, and found him sleeping in his bedroom. She saw his cell phone lying on the bed and plugged it in to charge when she saw that he had been texting with Deters. Johnson testified that she awakened Holcom, they argued about Deters, and she slapped him.

Johnson testified she was very upset and returned to Drake's house, where she parked in the garage because she was afraid of Holcom's reaction. At Drake's house, Johnson continued to cry and told Drake several times that she had hit Holcom. Didas and the Haught brothers were also present during this conversation. Drake suggested that somebody go to Holcom's house to get his side of the story. Johnson testified that she was unaware that the men left Drake's house and did not recall giving directions to Holcom's house. She denied asking anyone to "take care of" Holcom and stated that she did not want anyone to harm Holcom. When the men returned, they seemed upset, and Johnson believed they had been fighting between themselves. She noticed blood on A.J.'s hand but did not think anything of it because he had scars and cuts on his hands. She denied hugging A.J. when the men returned. Although Drake washed clothes for Johnson and A.J., she testified that she did not ask Drake to do so.

Following the close of the evidence, the district court and the parties discussed jury instructions. The district court denied Johnson's request to instruct the jury on the lesser included offenses of intentional and reckless aggravated battery. The jury found Johnson guilty of one count of misdemeanor battery and one count of aggravated battery. On December 7, 2010, the district court sen-

tenced Johnson to 21 months' imprisonment. Johnson timely appealed.

## DID THE DISTRICT COURT ERR IN INSTRUCTING THE JURY?

Johnson first claims the district court erred in instructing the jury. Specifically, she claims the district court erred by denying her request to instruct the jury on the lesser included offenses of intentional and reckless aggravated battery. She also claims the district court erred by failing to instruct the jury on the defense of voluntary intoxication.

### Lesser included offenses

Johnson was convicted of aggravated battery (intentional great bodily harm) in violation of K.S.A. 21-3414(a)(1)(A), a severity level 4 person felony. The State's theory was that Johnson was guilty of aggravated battery by aiding and abetting A.J.'s conduct. At trial, the district court denied Johnson's request to instruct the jury on the lesser included offenses of intentional and reckless aggravated battery. On appeal, Johnson contends the district court erred in taking from the jury the questions of whether A.J.'s conduct was intentional or reckless and whether the result was bodily harm or great bodily harm.

When an instruction has been requested, a district court has a duty to instruct the jury on any lesser included offense established by the evidence, regardless if that evidence is weak or inconclusive. However, there is no duty to instruct on a lesser included offense if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. When reviewing a district court's refusal to give a requested instruction, an appellate court must view the evidence in the light most favorable to the requesting party. *State v. Henson*, 287 Kan. 574, 582, 197 P.3d 456 (2008).

This court recently examined the aggravated battery statute, K.S.A. 21-3414, in the context of jury instructions in *State v. Simmons*, 45 Kan. App. 2d 491, 249 P.3d 15 (2011), *rev. granted* September 21, 2011. The *Simmons* court stated:

"Instructing a jury on aggravated battery is hardly a ministerial task. The crime, as outlined in K.S.A. 21-3414, encompasses a series of related, though distinct, felony offenses carrying different levels of punishment. The statute outlines the following offenses:

"• intentionally causing 'great bodily harm' or disfigurement to another person, a severity level 4 person felony;

"• intentionally causing 'bodily harm' to another by use of a deadly weapon or 'in a manner whereby great bodily harm, disfigurement or death can be inflicted,' a severity level 7 person felony;

: "• intentionally causing 'physical contact' with another person by use of a deadly weapon when done in a rude, insulting, or angry manner or 'in a manner whereby great bodily harm, disfigurement or death can be inflicted,' a severity level 7 person felony;

"• recklessly causing 'great bodily harm' or disfigurement to another person, a severity level 5 person felony; and

"• recklessly causing 'bodily harm' to another by use of a deadly weapon or 'in a manner whereby great bodily harm, disfigurement or death can be inflicted,' a severity level 8 person felony." 45 Kan. App. 2d at 498.

With respect to whether A.J.'s conduct was intentional or reckless, Johnson concedes that A.J. intended to engage in the underlying conduct—that is, A.J. intended to hit Holcom. However, Johnson argues that "intentional" as used in the aggravated battery statute requires proof of the intent to cause great bodily harm rather than merely the intent to engage in the underlying conduct which resulted in great bodily harm. As there was some evidence tending to show that A.J. did not intend to beat Holcom as badly as he did, Johnson concludes that the district court erred in refusing to instruct on lesser included charges involving "reckless" aggravated battery because a reasonable jury could find that, although A.J.'s underlying conduct was intentional, he was reckless in the degree of the harm he caused.

K.S.A. 21-3414(a)(1)(A) states that aggravated battery is "[i]ntentionally causing great bodily harm to another person or disfigurement of another person." This court has held that aggravated battery is a general intent crime. *Gross v. State*, 24 Kan. App. 2d 806, 808-09, 953 P.2d 689, *rev. denied* 264 Kan. 821 (1998). In *Gross*, the defendant argued there was insufficient evidence to establish that he intended to cause great bodily harm to the victim. The *Gross* court found, however, that whether the defendant pos-

sessed a specific intent to cause great bodily harm was irrelevant. The court stated:

> "Prior to its amendment in 1992, the crime of aggravated battery under K.S.A. 21-3414 was a specific intent crime. See *State v. Diaz & Altemay*, 232 Kan. 307, 311, 654 P.2d 425 (1982). This statute required not only purposeful conduct but that the act be done with the specific 'intent to injure.' However, K.S.A. 21-3414 now requires only that the underlying act be intentional rather than accidental; there is no longer a statutory requirement of a specific intent to injure. Under these circumstances, the State is not required to prove that Gross intended the precise harm or result that occurred. See *State v. Mountjoy*, 257 Kan. 163, Syl. ¶ 7, 891 P.2d 376 (1995)." 24 Kan. App. 2d at 808.

Thus, the *Gross* court found not only that aggravated battery is a general intent crime, but that the requisite general intent is merely the intent to engage in the underlying conduct. The State is not required to prove that the defendant intended the precise harm or result that occurred. See also *Showalter v. State*, No. 94,883, 2006 WL 3000757, at *1 (Kan. App. 2006) (unpublished opinion) (where defendant acknowledged his conduct was purposeful and the conduct resulted in great bodily harm, the defendant's specific intent was not relevant).

Under K.S.A. 21-3201, criminal intent may be established where the defendant's conduct is intentional or reckless:

> "(a) Except as otherwise provided, a criminal intent is an essential element of every crime defined by this code. Criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. Proof of intentional conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a reckless manner.
> "(b) Intentional conduct is conduct that is purposeful and willful and not accidental. . . .
> "(c) Reckless conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger."

Thus, under K.S.A. 21-3201, criminal conduct may be *either* intentional *or* reckless; it cannot simultaneously be both, as Johnson appears to suggest. Here, it is undisputed that A.J. acted intentionally in that his underlying conduct was purposeful rather than accidental. Therefore, the district court did not err in refusing

to instruct the jury on lesser included charges involving "reckless" conduct, because no reasonable jury could have found A.J.'s conduct was reckless given the evidence presented at trial.

With respect to whether the injuries suffered by Holcom constituted either bodily harm or great bodily harm, Johnson argues that the district court erred in concluding that no reasonable jury could find Holcom's injuries did not constitute great bodily harm and thus refusing to instruct on lesser included charges involving mere bodily harm. Johnson notes that whether a particular injury constitutes bodily harm or great bodily harm is generally a question of fact for the jury to decide. *State v. Green,* 280 Kan. 758, 765, 127 P.3d 241, *cert. denied* 549 U.S. 913 (2006). The State acknowledges that courts generally favor letting juries decide the degree of injury but argues that, on the facts of this case, no reasonable jury could have found Holcom's injuries did not constitute great bodily harm. See *State v. Valentine,* 260 Kan. 431, 435, 921 P.2d 770 (1996) ("through and through" bullet wound constitutes great bodily harm).

Although the difference between bodily harm and great bodily harm is not subject to precise definition, our Supreme Court has noted that bodily harm has been defined as any touching of the victim against the victim's will, with physical force, in an intentional hostile and aggravated manner. The word "great" distinguishes the bodily harm necessary to prove aggravated battery from slight, trivial, minor, or moderate harm, and as such it does not include mere bruises, which are likely to be sustained in simple battery. *State v. Whitaker,* 260 Kan. 85, 93, 917 P.2d 859 (1996).

Here, the evidence showed that Holcom suffered multiple facial fractures involving both cheekbones and the upper jaw. His left cheekbone was broken in several pieces and his upper jaw was totally disassociated from the rest of his face. Holcom was hospitalized for 5 days and his injuries required surgery to repair, which involved affixing titanium plates to realign bone fragments and wiring his upper jaw to his lower teeth. Holcom received several scars and had some persisting deformity of his cheekbone and nose. As of the date of trial, Holcom continued to have difficulty opening his mouth. Moreover, several photographs admitted at trial show

Holcom's bed and wall covered in blood and the extensive swelling, bruising, and laceration of Holcom's face. Bell, who performed surgery on Holcom, characterized his injuries as "in the top five worst facial injuries I've ever seen, including car wrecks and other types of massive trauma," in his 30 years of medical practice. Given the extent of Holcom's injuries, no reasonable jury could conclude he did not suffer great bodily harm, and therefore the district court did not err in refusing to instruct the jury on lesser included charges involving mere bodily harm.

*Voluntary intoxication*

Johnson argues that the district court erred in failing to give a voluntary intoxication instruction where the evidence showed that she had been drinking on the night of the events at issue. She notes that aiding and abetting is a specific intent crime and contends that her voluntary intoxication rendered her incapable of forming the specific intent necessary to aid and abet an aggravated battery. See K.S.A. 21-3205; *State v. Johnson*, 258 Kan. 475, 485-86, 905 P.2d 94 (1995).

In a criminal action, the district court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the district court's refusal to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction. *State v. Hayden*, 281 Kan. 112, 131-32, 130 P.3d 24 (2006).

The mere fact that the defendant recently had consumed alcohol or drug at the time the crime was committed is insufficient to establish the defense of voluntary intoxication. To require the giving of an instruction on voluntary intoxication "[t]here must be some evidence of intoxication upon which a jury might find that a defendant's mental faculties were impaired to the extent that he was incapable of forming the necessary specific intent required to commit the crime." *State v. Shehan*, 242 Kan. 127, 131-32, 744 P.2d 824 (1987). The burden is on the defendant to make this showing. *State v. Johnson*, 258 Kan. 475, 486, 905 P.2d 94 (1995).

Here, the evidence showed that although Johnson had been drinking, she was able to drive to pick up Drake's children, drive to Drake's house, and later drive to Holcom's house and back. Drake testified that Johnson did not appear to be drunk, and she was oriented to her surroundings. Although Johnson testified on her own behalf, she did not claim that she was too drunk to be responsible for her actions. Her defense at trial was that she never requested A.J. to beat Holcom and that he took this action on his own. Johnson's ability to give a detailed and coherent account of her actions on the night in question is inconsistent with a defense of intoxication. See *State v. Smith*, 278 Kan. 45, 50, 92 P.3d 1096 (2004) (voluntary intoxication instruction would have been factually inconsistent with defendant's detailed recollection of the events). We conclude the evidence presented at trial was insufficient to show that Johnson's mental faculties were impaired to the extent she was incapable of forming the specific intent necessary to aid and abet an aggravated battery. Therefore, the district court did not err in failing to instruct the jury on the defense of voluntary intoxication.

## SUFFICIENCY OF EVIDENCE TO SUPPORT JOHNSON'S CONVICTION OF AGGRAVATED BATTERY BY AIDING AND ABETTING

Next, Johnson claims the evidence was insufficient to support her conviction of aggravated battery by aiding and abetting. Specifically, Johnson contends that the jury was instructed on several alternative means of aiding and abetting and that there was insufficient evidence to support each of the alternative means. Johnson also contends that there was insufficient evidence to support any theory of aiding and abetting.

When the sufficiency of the evidence is challenged in a criminal case, an appellate court reviews all the evidence, viewed in the light most favorable to the prosecution, to determine whether the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011). In determining whether there is sufficient evidence to support a conviction, an appellate court

generally will not reweigh the evidence or the credibility of witnesses. *State v. Trautloff*, 289 Kan. 793, 800, 217 P.3d 15 (2009).

*Alternative means*

In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. However, unanimity is not required as to the means by which the crime was committed so long as sufficient evidence supports each alternative means. *State v. Wright*, 290 Kan. 194, 202-06, 224 P.3d 1159 (2010).

"Alternative means essentially entail *materially* different ways of committing a particular crime based on the statutory definition or elements of the offense. When criminal statutes create two or more *distinct* ways of committing an offense, those ways reflect alternative means. Other criminal statutes establish only one way to commit an offense, although they may use synonymous or redundant terms to define the prohibited conduct. Such statutes do not set forth alternative means." (Emphasis added.) *State v. Schreiner*, 46 Kan. App. 2d 778, Syl. ¶ 1, 264 P.3d 1033 (2011).

Johnson argues that the aiding and abetting statute, K.S.A. 21-3205, sets forth alternative means of committing a crime. K.S.A. 21-3205(1) states: "A person is criminally responsible for a crime committed by another person if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." The instruction provided to the jury in this case stated:

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Whether K.S.A. 21-3205 sets forth alternative means of committing a crime is an issue of first impression in Kansas. Black's Law Dictionary defines "aid and abet" as one term meaning "to assist or facilitate the commission of a crime, or to promote its accomplishment." Black's Law Dictionary 81 (9th ed. 2009). The common term "aiding and abetting" essentially encompasses the remaining terms in K.S.A. 21-3205(1). In other words, the terms "advises," "hires," "counsels," and "procures" are simply more spe-

cific ways to aid and abet a crime. There is no material difference between advising or counseling someone to commit a crime. Johnson emphasizes that the terms "hires" and "procures" mean something different than the other terms in K.S.A. 21-3205(1). The term "hire" is defined as "[t]o engage the labor or services of another for wages or other payment." Black's Law Dictionary 799. Although we agree that the term "hires" has a more distinctive meaning than the other terms in K.S.A. 21-3205(1), when all the terms are considered in the proper context, they are essentially synonymous or redundant terms to define the same prohibited conduct. The legislature could have added a number of other illustrative terms to the statute, but that does not mean that each term would create an additional alternative means to commit a crime.

It is significant to note that K.SA. 21-3205 does not define a crime in and of itself. The statute is included in the criminal code under Article 32 defining principles of criminal liability. K.S.A. 21-3205 explains the circumstances under which a person may be criminally responsible for a crime committed by another person. Our Supreme Court repeatedly has held that to be guilty of aiding and abetting under K.S.A. 21-3205, a defendant must "willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed." *State v. Schriner*, 215 Kan. 86, 92-93, 523 P.2d 703 (1974); see *State v. Green*, 280 Kan. at 761; *State v. Jackson*, 280 Kan. 16, 29, 118 P.3d 1238 (2005); *State v. Hobson*, 234 Kan. 133, 137-38, 671 P.2d 1365 (1983). Courts have essentially interpreted the language of K.S.A. 21-3205(1) as merely setting forth various examples as to how a person might willfully participate in an unlawful venture. In other words, it is not the precise characterization of a person's actions but rather his or her purpose in undertaking such actions that is of import.

Although there are minor differences in the meaning of the terms "aids," "abets," "advises," "hires," "counsels," and "procures," we find that these terms do not entail materially different or distinct ways of committing a particular crime. The thrust of K.S.A. 21-3205 is that a person who knowingly induces or assists another person to commit a crime is criminally responsible for the

crime regardless of the extent the person participates in the actual commission of the crime. We conclude that K.S.A. 21-3205(1) does not set forth alternative means of committing a crime.

*Sufficiency of the evidence*

Because this is not an alternative means case, this court need only determine whether there was sufficient evidence to support Johnson's conviction of aggravated battery on any theory of aiding and abetting. To accomplish this task, we view the evidence in the light most favorable to the prosecution. *McCaslin,* 291 Kan. at 710. Furthermore, we do not reweigh the evidence or the credibility of witnesses. *Trautloff,* 289 Kan. at 800.

Here, the evidence showed that Johnson was extremely upset about Holcom's relationship with Deters. Johnson had discovered the relationship several weeks prior to March 11, 2010, and she had told Richardson that she was "going to put someone in a coffin" over the affair. When Johnson confronted Holcom about his ongoing relationship with Deters, she struck him in the face. As she was leaving his house, she told Holcom that he had "better watch [himself] and watch [his] truck." Also, Johnson contacted Richardson and told him the affair between Holcom and Deters was not over and that "that whore will die," referring to Deters.

At Drake's house, Johnson told A.J. that she wanted him to "take care of it," which he understood to mean that she wanted him to beat Holcom. Johnson gave the men specific directions to Holcom's house, including how to enter through a side door, where Holcom's room was located within the house, and where the light switch was located within Holcom's room. After the men left, Johnson told Drake that "they're gonna hurt him." When the men returned, A.J. was covered in blood and he told Johnson that they had "taken care of it." Johnson thanked A.J., gave him a hug, and agreed to go to dinner with him. She then asked Drake to wash some clothes, including A.J.'s bloody sweatshirt.

From the foregoing evidence, a rational factfinder could reasonably infer that Johnson was very upset about the affair between Holcom and Deters and that when she asked A.J. to "take care of it," she meant for him to beat Holcom rather than to simply get

Holcom's side of the story. A rational factfinder could further infer that Johnson's directions to Holcom's house, including entry through a side door and the location of Holcom's room within the house, were given so that the men could take Holcom by surprise rather than confront him openly and constituted advice on how to commit the crime. Although there is evidence in the record which supports a different conclusion, it was the jury's prerogative to determine witness credibility, the weight of the evidence, and any reasonable inferences that may be drawn from the evidence. Considering the evidence in the light most favorable to the prosecution, we conclude there was sufficient evidence to support Johnson's conviction of aggravated battery by aiding and abetting.

Affirmed.