NOT DESIGNATED FOR PUBLICATION

No. 121,279

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH HUBERT DREILING,
*Appellant*.

MEMORANDUM OPINION

Appeal from Kearny District Court; RICKLIN PIERCE, judge. Opinion filed February 12, 2021. Affirmed in part, reversed in part, sentence vacated, and remanded with directions.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Kenny Estes*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, GREEN and ATCHESON, JJ.

PER CURIAM:  Joseph Hubert Dreiling was convicted by a jury of attempted arson, criminal threat, stalking, assault, and misdemeanor theft. He appeals from two of his convictions—criminal threat and attempted arson. In light of *State v. Boettger*, 310 Kan. 800, 822-23, 450 P.3d 805 (2019), *cert. denied* 140 S. Ct. 1956 (2020), and *State v. Johnson*, 310 Kan. 835, 842, 450 P.3d 790 (2019), *cert. denied* 140 S. Ct. 1956 (2020), we must reverse Dreiling's criminal threat conviction, vacate his sentence, and remand this case to the district court for further proceedings. However, we affirm Dreiling's attempted arson conviction because we find it to be supported by sufficient evidence.

1

In October 2018, Dreiling's brother—who worked as an animal control officer for the City of Deerfield—impounded his dog. Dreiling became upset when his brother told him that he had to pay a fine to get his dog back. According to Dreiling, his brother knew that he did not have the ability to pay the fine.

A few days later, Dreiling saw his brother fixing a sprinkler head at a local park. Dreiling told his brother that he had "until sundown" to give him his dog back or he was "going to regret it." At about 5 p.m. that evening, Dreiling told one of his nieces that he was going to kill his brother. He also told her he was going to blow up the house he lived in that was owned by his brother.

A short time later, Dreiling posted a message on Facebook in which he again stated his intention to burn down the house. In particular, Dreiling stated in his posts that he would blow himself up and burn down the house if his dog was not returned that evening. He also posted photographs of the outside and the inside of the house. These photos depicted a number of lit candles and up to five cans of gasoline in the house. In addition, they showed a propane tank sitting in his lap with an extended nozzle pointed at a lit oil lamp.

The Kearny County Sheriff's Department was contacted by several people who were concerned about Dreiling's safety and the threats he posted on Facebook. In response, Deputy Isaac Luna and Deputy Garnett Hartman went to the house around 8 p.m. for a welfare check. When they arrived, they found Dreiling sitting in a chair in the front room surrounded by five gas cans, lit candles, a lit oil lamp, and a propane tank. The deputies also smelled fumes from what they believed to be a flammable liquid.

Specifically, the deputies saw that Dreiling had ten or more lit candles sitting near the gasoline cans, and he had a small propane tank sitting in front of him. They also saw Dreiling holding an old-fashioned oil lamp that was also lit. According to the deputies, many of the lit candles were stuffed inside "alcohol bottles" and the propane tank had an extension on the valve. Dreiling was holding the propane tank pointed toward the flame of the lit oil lamp that he was also holding.

Dreiling told the officers that he was going to blow himself up and burn down the house. The deputies believed that there could be an explosion or fire at any moment based on their observations as well as the fumes. The deputies spoke to Dreiling to try to figure out what was wrong and how they could assist him. Dreiling responded that he was upset that his dog had been impounded by his brother. He also told the deputies that he wanted his dog back, a 30-pack of beer, and a pack of cigarettes by 9 p.m. or he would blow himself up.

When the deputies suggested that law enforcement officers might come and force him out of the house, Dreiling responded that he possibly had a couple of improvised explosive devices (IEDs) in the house. As a result, the deputies decided to back off and call dispatch to request additional back up to stage the area. They also requested that EMS be sent to the area. Subsequently, Trooper Anthony Calderon of the Kansas Highway Patrol set up a perimeter around the premises that extended the entire block around the house because he was concerned that a propane tank explosion near flames inside the house could impact the safety of the public.

At some point, Dreiling extinguished the candles but continued to hold the lit oil lamp in his hand and refused to put it down. The deputies feared that if Dreiling turned the valve on the propane tank that there would be an explosion and fire. Throughout the ordeal, Dreiling repeatedly told the deputies that if they did not give him what he wanted, he would release the propane from the tank and light everything on fire. Ultimately, the

3

deputies were able to convince Dreiling to extinguish the oil lamp, and he was taken into custody.

On October 10, 2018, Dreiling was charged with attempted arson, criminal threat, stalking, misdemeanor theft, and misdemeanor assault. The district court commenced a two-day jury trial on March 21, 2019. At trial, Dreiling represented himself. However, the district court appointed stand-by counsel to be available to answer any questions that he might have during trial. The State presented the testimony of 12 witnesses and introduced 12 exhibits that were admitted into evidence, including video evidence from Officer Hartman's body camera and photographs showing Dreiling in his home surrounded by the flammable substances and open flames.

After the State rested, the district court denied a motion to dismiss filed by Dreiling. In his defense, Dreiling testified on his own behalf and presented the testimony of three other witnesses. He also introduced one exhibit that was admitted into evidence. In his testimony, Dreiling claimed that he often fought with his brother but that it was a matter of "a lot more talk but no action." He indicated that he had had a bad month "[a]nd it just took its toll on me." Dreiling also testified he was "not expecting anything other than a keyboard war with his brother."

After deliberation, the jury found Dreiling guilty of all charges. The district court subsequently sentenced him to 20 months for attempted arson and 6 months for criminal threat to be served consecutive to each other. The district court also sentenced Dreiling to 10 months for the stalking conviction, 10 months for the theft conviction, and 1 month for the assault conviction. Those sentences were imposed concurrent to the sentences for attempted arson and criminal threat. Consequently, the district court imposed a controlling prison sentence of 26 months with 12 months of postrelease supervision.

4

Thereafter, Dreiling timely appealed his convictions for criminal threat and attempted arson. He did not appeal from his convictions for stalking, misdemeanor theft, and misdemeanor assault. Accordingly, each of those convictions stand.

ANALYSIS

*Criminal Threat Conviction*

The parties acknowledge that the Kansas Supreme Court has found that the criminal threat statute—K.S.A. 2018 Supp. 21-5415(a)(1)—is unconstitutionally overbroad. See *Boettger*, 310 Kan. at 823; *Johnson*, 310 Kan. at 842. Specifically, our Supreme Court held that the provision in K.S.A. 2018 Supp. 21-5415(a)(1) allowing a conviction to be based on a threat of violence made in reckless disregard of the risk of causing fear to another is unconstitutional. *Boettger*, 310 Kan. at 823. We note, however, that the district court did not have the benefit of reviewing these cases prior to instructing the jury because they were decided after the trial in this case.

Following the law in effect at the time of the trial, the district court instructed the jury that it could convict Dreiling if it found he communicated the alleged criminal threat either intentionally or in reckless disregard of the risk. In light of *Boettger* and *Johnson*, Dreiling argues that his criminal threat conviction must be reversed. In response, the State argues that any error was harmless because there is no reasonable possibility that the error affected the verdict in light of the entire record. See *Johnson*, 310 Kan. at 843; see also *Chapman v. California*, 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (defining the constitutional harmless error standard).

We pause to note that this constitutional issue has been raised for the first time on appeal. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before us for review. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877

5

(2018). However, there are several exceptions to this general rule, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; and (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights. *State v. Phillips*, 299 Kan 479, 493, 325 P.3d 1095 (2014).

Here, we are dealing with a question of law. Likewise, in light of the holdings in *Boettger* and *Johnson*, we find that consideration of this issue is necessary to serve the ends of justice. As our Supreme Court has held, there is a "longstanding rule that in a direct appeal, a defendant will receive the benefit of any change in the law that occurs while the direct appeal is pending." *State v. Murdock*, 309 Kan. 585, 591, 439 P.3d 307 (2019); see *Griffith v. Kentucky*, 479 U.S. 314, 322-23, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) (the integrity of judicial review requires that a new rule be applied to all similar cases pending on direct review). Thus, it is appropriate under these circumstances for us to decide this issue on the merits.

Dreiling was convicted of criminal threat in violation of K.S.A. 2018 Supp. 21-5415(a)(1), which provides:

"(a) A criminal threat is any threat to:

"(1) Commit violence communicated *with intent to place another in fear*, or to cause the evacuation, lock down or disruption in regular, ongoing activities of any building, place of assembly or facility of transportation, or *in reckless disregard of the risk of causing such fear* or evacuation, lock down or disruption in regular, ongoing activities." (Emphases added).

In *Boettger*, the Kansas Supreme Court concluded that the reckless disregard portion of the criminal threat statute "is unconstitutionally overbroad because it punishes conduct that may be constitutionally protected under some circumstances." 310 Kan. 800,

6

Syl. ¶ 3. Consequently, our Supreme Court found that a conviction under the criminal threat statute should be limited to intentional criminal threats. 310 Kan. at 822-23. On the same day, our Supreme Court reached a similar decision in *Johnson*. In particular, it found that where a district court instructed on both the intentional and reckless disregard versions of the statute, without also asking the jury to make a finding as to which version it was applying, the jurors "could have believed the [defendant's] statements were made with a reckless disregard for whether they caused fear." 310 Kan. at 844.

More recently, in *State v. Lindemuth*, 312 Kan. 12, 470 P.3d 1279 (2020), the Kansas Supreme Court followed the analysis in *Johnson*. In *Lindemuth*, our Supreme Court held that where a jury was instructed on both the intentional and reckless versions of the criminal threat statute, the record must clearly show that the jury concluded the threat was made intentionally rather than recklessly in order for the error to be harmless. Because this distinction could not be established from the record on appeal, Lindemuth's criminal threat conviction was reversed. Likewise, just as our Supreme Court had done in *Johnson*, it vacated Lindemuth's sentence and the case was remanded to the district court. 312 Kan. at 19.

Returning to the present case, the district court instructed the jury on both the intentional and reckless versions of the criminal threat statute. As in *Johnson* and *Lindemuth*, the district court—perhaps understandably based on the status of Kansas law at the time—did not instruct the jury that it had to agree unanimously about whether Dreiling acted intentionally or recklessly, and the jury was not required to make such an election on the verdict form. Although it is certainly possible that the jury believed that Dreiling made a criminal threat with the intent to place another in fear, it is also possible that the jury found Dreiling's threats to be made recklessly.

In particular, we note that Dreiling testified at trial that he had no intention to place anyone in fear. It is also important to note that in closing arguments, the State argued both intent and recklessness to the jury:

> "He's charged with a criminal threat, which constitutes the defendant threatened to commit violence and communicated that threat with the *intent to place another in fear*, Michael C. Dreiling, *or* the defendant threatened to commit violence and communicated that threat *with reckless disregard of the risk of causing fear in another*. This was *absolutely reckless behavior* to tell [his brother] you wait till sundown and to tell him I'm going to shoot—I'm going to blow his house up." (Emphasis added.)

Under the evidence and arguments presented at trial, we find that the jury could have reasonably found Dreiling to be guilty of either intentional criminal threat or reckless criminal threat. As in *Johnson*, the jury in this case "could have believed the [defendant's] statements were made with a reckless disregard for whether they caused fear." 310 Kan. at 844. Accordingly, we conclude that Dreiling's criminal threat conviction should be reversed, that his sentence should be vacated, and that the case remanded for further proceedings on the charge of intentional criminal threat.

*Attempted Arson Conviction*

Dreiling also contends that the State presented insufficient evidence to support his conviction for attempted arson. He suggests that his actions were mere preparations and that he did not take any steps in the direction of actually committing the crime of arson. In response, the State argues that there is sufficient evidence to support Dreiling's attempted arson conviction. In particular, the State points to the physical evidence as well as Dreiling's posts on Facebook regarding his intent. The State further suggests that "[i]f not for the patience and professionalism of a number of members of the Kearny County Sheriff's Office, the situation would have been catastrophic."

When the sufficiency of evidence is challenged following a criminal conviction, we are required to review the evidence in the light most favorable to the prosecution because it was the prevailing party below. Based on this review of the evidence, we must determine whether a rational factfinder could have found the defendant guilty of the crime beyond a reasonable doubt. In making this determination, we are not to "'reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The elements for the crime of attempted arson are found in two statutes—K.S.A. 2018 Supp. 21-5301 and K.S.A. 2018 Supp. 21-5812. First, K.S.A. 2018 Supp. 21-5301(a) defines an attempt as "*any overt act toward the* perpetration of a crime *done by a person who intends to commit such crime but* fails in the perpetration thereof or *is prevented or intercepted in executing such crime*." (Emphases added.) Second, K.S.A. 2018 Supp. 21-5812(a)(1)(A) defines arson as "[k]nowingly, by means of fire or explosive, damaging any building or property which . . . is a dwelling in which another person has any interest without the consent of such other person."

Accordingly, an attempt to commit a crime is a crime separate and distinct from the substantive offense to which it is connected. In other words, an attempt is a crime that focuses on actions taken by a defendant in the direction of accomplishing the underlying substantive offense. Thus, to support a conviction for an attempted crime, the evidence must be sufficient to convince a rational fact-finder—in this case the jury—beyond a reasonable doubt that the defendant intended to commit the underlying substantive crime and performed an actual or outward act directed toward the commission of the substantive crime. See *State v. Harris*, 310 Kan. 1026, 1030, 453 P.3d 1172 (2019); *Commonwealth v. LaBrie*, 473 Mass. 754, 764, 46 N.E.3d 519 (2016) ("The elements of attempt . . . are (1) the specific intent to commit the substantive crime at issue, and (2) an overt act toward completion of the substantive crime.").

Although what circumstances constitute an overt act depend on the facts of each case, it "must extend beyond mere preparations . . . and must approach sufficiently near to the consummation of the offense to stand either as the first step or subsequent step in a direct movement toward the completed offense." *State v. Hedges*, 269 Kan. 895, Syl. ¶ 3, 8 P.3d 1259 (2000). In *State v. Garner*, 237 Kan. 227, 699 P.2d 468 (1985), our Supreme Court found that an overt act sufficient to constitute an attempt might include the defendant arriving on the scene where the crime is to occur. 237 Kan. at 238-39; see *Commonwealth v. Peaslee*, 177 Mass. 267, 271, 273-74, 59 N.E. 55 (1901) (no overt act constituting attempted arson where a defendant arranged combustibles in a building and later drove to building with intent to light them, but stopped within one-quarter mile of building and drove away). Thus, to prove attempted arson, the State must come forward with sufficient evidence to show that the defendant had the intent to commit the underlying substantive crime of arson and that he or she took some action toward its completion.

Returning to this case, a review of the record reveals that the district court appropriately instructed the jury on the crime of attempted arson. Specifically, Instruction No. 5 advised the jury that the State was required to prove the following elements beyond a reasonable doubt:

> "1. The defendant performed an overt act toward the commission of Arson.
>
> "2. The defendant did so with the intent to commit Arson.
>
> "3. The defendant failed to complete commission of Arson.
>
> "4. This act occurred on or about the 3rd day of October 2018, in Kearny County, Kansas."

In addition, the district court correctly instructed the jury in that same instruction as follows:

10

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act."

The district court also properly instructed the jury regarding the elements of the crime of arson in Instruction No. 5 as follows:

"1. The defendant knowingly, by means of fire or an explosive, damaged a building in which [his brother] had an interest, without the consent of [his brother].
"2. The property was a dwelling.
"3. This act occurred on or about the 3rd day of October, 2018, in Kearny County, Kansas."

Moreover, the district court accurately informed the jury that the State must prove that "[a] defendant acts intentionally when it is the defendant's desire or conscious objective to do the act complained about by the State."

Because each case is dependent on the specific facts of the case and the reasonable inferences the jury may draw from those facts, it is the role of the jury—not this court—to weigh the evidence and to determine whether an overt act occurred. *State v. Peterman*, 280 Kan. 56, 61, 118 P.3d 1267 (2005). In reviewing the evidence presented at trial in the light most favorable to the State, we find that the evidence was sufficient for the jury to conclude that Dreiling intended to commit the crime of arson and that he took an overt act toward completing the crime. In particular, we note that this is not a case in which Dreiling simply set up the room with flammable and explosive materials. Likewise, this is not a case in which Dreiling changed his mind and walked away or took other evasive action.

Instead, the evidence presented by the State establishes that Dreiling intentionally lit candles and an oil lamp and placed them in close proximity to flammable and

11

explosive materials that he had previously placed in the room. In addition, Dreiling was holding a lamp with an open flame while at the same time holding the propone tank with the valve extension.

These intentional actions were taken by Dreiling after he had already prepared by placing multiple gasoline cans and a propane tank in the front room. From the photographs admitted into evidence, the jury could see that the items were very close together in a small room. Even after the deputies arrived at his house to conduct a welfare check in response to the threats he made on Facebook, Dreiling continued to threaten to burn down or blow up the house. He also continued to hold the lit oil lamp in his lap in close proximity to the propane tank and had the valve of the tank pointed directly at the open flame of the lamp. In addition, Dreiling refused to put out the lit candles he had placed near the gasoline cans when he was first confronted by the deputies.

At trial, the deputies also testified that they feared that Dreiling holding the propone tank near the open flames of the candles and the lit oil lamp would ignite the fumes coming from the gasoline cans, the lamp, or the propane tank. As a result, they called for backup, and the Kansas Highway Patrol established a perimeter for the entire block around the house to protect those in the vicinity. Viewing the evidence presented at trial in the light most favorable to the State, we conclude that the jury could have found beyond a reasonable doubt that Dreiling committed an "overt act toward the perpetration of" the crime of arson, that he intended to commit the crime of arson, and that he was "prevented or intercepted [by law enforcement officers] in executing such crime." K.S.A. 2018 Supp. 21-5301(a).

We pause to note that Dreiling cites two cases in support of his claim that the State's evidence fails to support the crime of attempted arson. First, he cites *State v. Johnson*, 12 Kan. App. 2d 239, 738 P.2d 872 (1987). In that case, the defendant was convicted of attempted arson after throwing a Molotov cocktail through the window of a

12

law firm. In affirming the conviction, this court did not address the question of what constitutes an overt act because the issue was not presented to it by the parties. As such, we do not find the *Johnson* opinion to provide guidance to us in resolving this case.

Second, Dreiling cites *Hedges*, in which the defendant was convicted of attempted arson after breaking into his ex-wife's home, pouring gasoline over a large part of the residence, and making threats to start a fire with a cigarette and with a lighter. On appeal, the Kansas Supreme Court found that the State had produced sufficient evidence of the overt act necessary to sustain a conviction for attempted arson. As indicated above, the overt act sufficient to support the crime of arson can be the first or any subsequent step toward commission of the crime after preparations are made. 269 Kan. at 905.

We do not find *Hedges* to be particularly helpful to Dreiling's defense. As we have found, there is sufficient evidence in the record of this case that Dreiling took one or more overt steps toward completion of the crime after he made the initial preparations by setting up the living room with flammable or explosive materials. Again, these overt steps taken by Dreiling after his initial preparations include the intentional acts of lighting the candles, placing them near the gasoline cans, lighting the oil lamp, and holding it near the valve of the propane tank.

Finally, we turn to the issue of whether there is sufficient evidence upon which the jury could conclude beyond a reasonable doubt that Dreiling intended to commit the crime of arson. K.S.A. 2018 Supp. 21-5202(h) provides that a person acts with intent "when it is such person's conscious objective or desire to engage in the conduct or cause the result." As discussed above, "[a]ttempt requires specific intent to commit the object crime." *State v. Louis*, 305 Kan. 453, 461, 384 P.3d 1 (2016). Furthermore, intent may be proven by circumstantial evidence because direct evidence of a defendant's state of mind is rarely available. See *State v. Thach*, 305 Kan. 72, 83, 378 P.3d 522 (2016).

13

In order to be sufficient, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Rather, it is up to the fact-finder to determine the weight to give the evidence and to determine the reasonable inferences to be drawn from that evidence. *State v. Johnson*, 46 Kan. App. 2d 870, 887, 265 P.3d 585 (2011). Based on our review of the record, we find that the State presented sufficient evidence upon which the jury could decide beyond a reasonable doubt that Dreiling intended to commit the crime of arson.

Although Dreiling suggested at trial that he never really intended to burn down or blow up the house, he repeatedly stated his intent to do so—both orally and in writing—in a variety of forums. After making threats to his brother about taking his dog, Dreiling specifically told his niece that he intended to kill his brother and to blow up the house. A short time later, he expressed his intent to burn the house down in several social media posts. In one of his Facebook posts, Dreiling stated: "I'm sitting here surrounded by 20 gallons of kerosene. A tank of propane. And 2 to 3000 rounds of ammo candles burning and no fucking dog." Dreiling also posted photographs of the flammable and explosive substances and the lit candles inside the residence.

Because of concerns over the statements made and the pictures posted by Dreiling on Facebook, several members of the public reported it to the Kearny County Sheriff's Department. When deputies arrived at the house around 8 p.m., they found Dreiling sitting in a small front room surrounded by several gasoline cans on the floor, with lit candles sitting next to the gasoline cans, and holding the valve of the propone tank near the open flame of the oil lamp sitting in his lap. Instead of extinguishing the candles and the oil lamp or otherwise following the deputies' instructions to exit the residence, Dreiling made several demands to be fulfilled by 9 p.m. or he would set the house on fire. Based on our review of the evidence in the record in the light most favorable to the State, we conclude that sufficient evidence was presented at trial upon which the jury could find

14

beyond a reasonable doubt that Dreiling intended to burn down or blow up the house owned by his brother.

In conclusion, we find that Dreiling's conviction for attempted arson should be affirmed. However, we find that his conviction for criminal threat should be reversed and that his sentence should be vacated. Futher, we find that this case should be remanded to the district court for further proceedings on the charge of intentional criminal threat. Finally, we again note that Dreiling has not appealed from his convictions for stalking, misdemeanor theft, and misdemeanor assault, and those convictions stand.

Affirmed in part, reversed in part, sentence vacated, and remanded with directions.

* * * *

ATCHESON, J., concurring in part and dissenting in part: In an ongoing dispute with his brother, Defendant Joseph Hubert Dreiling threatened to burn down the house where he lived—a house his brother owned—and to kill himself in the process. A jury sitting in Kearny County District Court convicted Dreiling of making a criminal threat and of attempted arson, both felonies. I agree we are obligated to reverse and remand the criminal threat conviction, affording Dreiling a new trial. But the evidence failed to establish an attempted arson, so I would reverse that conviction and enter a judgment acquitting Dreiling of that crime. In short, I respectfully concur in part and dissent in part with the majority's resolution of this appeal.

Based on the Kansas Supreme Court's determination that the criminal threat statute, K.S.A. 2018 Supp. 21-5415(a)(1), is constitutionally overbroad in the way it proscribes reckless conduct, we must reverse Dreiling's conviction. *State v. Boettger*, 310 Kan. 800, 822-23, 450 P.3d 805 (2019), *cert. denied* 140 S. Ct. 1956 (2020). The jurors had the option of convicting him of either acting recklessly or knowingly, and given the

15

general verdict finding him guilty, we can't tell which they chose. That ambiguity filtered through the rule in *Boettger* requires us to reverse the conviction and remand with directions that the district court grant Dreiling a new trial. *State v. Johnson*, 310 Kan. 835, 844, 450 P.3d 790 (2019), *cert. denied* 140 S. Ct. 1956 (2020). I agree with my colleagues on that point.

The attempted arson conviction is another matter. Although we are obligated to examine the trial record in the best light for the State in considering a challenge to the sufficiency of the evidence, Dreiling never committed a requisite overt act to support the conviction. See *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 1, 422 P.3d 72 (2018) (standard of review). To be convicted of an attempt, a defendant must go beyond mere preparation and take a step—the overt act—that is the first or an essential act in an unbroken and temporally proximate progression to the completed crime. If a defendant then fails to carry out the crime or is prevented from doing so, he or she may be convicted of an attempt to commit that crime. K.S.A. 2018 Supp. 21-5301(a).

In relevant part, the statute criminalizing arson prohibits an individual from damaging a building in which another person has an interest by means of fire or an explosive. K.S.A. 2018 Supp. 21-5812(a)(1)(A). Here, the jurors had to find Dreiling went beyond preparation to commit an arson and then failed to complete the crime. There is no clear rule dividing "mere preparation" from an "overt act" for criminal attempts. The division often rests on the elements of the underlying crime and the specific factual circumstances. And some conduct may fall close to the inevitably elusive line between the two. Dreiling's actions may make the line hard to find, but it is there. Although his conduct came very close to the line, Dreiling never undertook an overt act to complete the threatened arson.

Dreiling undeniably made preparations to burn down the house—very elaborate preparations. He brought flammable materials into the house. He lit a bunch of candles

16

that could have been used to ignite those materials. And he had a propane tank and an oil lamp literally at hand. In short, Dreiling assembled multiple instrumentalities sufficient to carry out an arson. He was, then, well prepared.

Moreover, Dreiling made a spectacle of those preparations, announcing his intentions on social media and repeating them to law enforcement officers who arrived at the house. So unlike most arsonists who plot and carry out their crimes furtively to avoid detection, Dreiling wanted to be seen and heard amidst the incendiary devices he had collected. A couple of key facts illustrate why that setting, as foolhardy and dangerous as it was, didn't include an overt act.

When law enforcement officers got to the house, Dreiling had not tried to set the building on fire and he did nothing while they were there to do so. The circumstances were in stasis. And they could have continued that way indefinitely without the house being damaged. Dreiling did not take a direct step or action to torch the house only to fail. In addition, Dreiling gave the officers an ultimatum:  He wanted beer, cigarettes, and his dog. He told the officers if that didn't happen within the next hour or so, he would light up the house and kill himself in the process. While Dreiling's demand may have been a pretty clear criminal threat of violence, it shows he had no imminent intention to burn down the house. To the contrary, Dreiling was holding the house hostage to regain his dog and to satisfy his desire for beer and cigarettes. He wasn't acting to immediately set the house ablaze, since that would have thwarted his objective. Rather, he declared he was prepared to do so.

By way of counterpoint, Dreiling would have taken an overt act if he had opened the valve on the propane tank—a direct step in burning down or blowing up the house, especially since he was holding an oil lamp with an open flame. If the valve had malfunctioned or the tank had turned out to be empty, Dreiling would have tried and failed. And he would have been guilty of attempted arson.

17

The undisputed facts, however, fall short of the legal requirement for an overt act. When insufficient evidence supports a conviction, the appropriate remedy requires reversal of the conviction and entry of a judgment of acquittal. See *Tibbs v. Florida*, 457 U.S. 31, 40-41, 102 S. Ct. 2211, 72 L. Ed. 2d 652 (1982); *State v. Hollins*, 9 Kan. App. 2d 487, 489-90, 681 P.2d 687 (1984); *State v. Watt*, No. 121,266, 2020 WL 7413776, at *4 (Kan. App. 2020) (unpublished opinion). I would follow that course with Dreiling's conviction for attempted arson.