NOT DESIGNATED FOR PUBLICATION

No. 120,606

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSEPH MATTHEW CARDILLO,
*Appellant*.


MEMORANDUM OPINION

Appeal from Montgomery District Court; JEFFREY GETTLER, judge. Opinion filed March 26, 2021. Reversed in part, vacated in part, and remanded with directions.

*Ryan Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., BRUNS and POWELL, JJ.


PER CURIAM:  A jury convicted Joseph Matthew Cardillo of possession of methamphetamine with intent to distribute, criminal threat, and aggravated failure to appear. As a result of these convictions, the district court sentenced Cardillo to 122 months' imprisonment. He now brings this direct appeal from his convictions and sentence. For the reasons below, we vacate Cardillo's sentence on his drug charge, we reverse the defendant's conviction for criminal threat, and we remand the case for resentencing and other proceedings as noted.

1

In early 2016, Montgomery County Sheriff's deputies were actively seeking to stop Cardillo and investigate his suspected involvement in narcotics trafficking. Around 8:30 p.m., Sheriff's Deputy Rickie Long stopped Cardillo's vehicle for an expired license plate tag. Only a few minutes after Long stopped the vehicle and before he contacted the occupants of the stopped vehicle, two other officers arrived at the traffic stop—Deputy Will Wilkinson and Sergeant Jeremy Hunsucker. Long approached the vehicle and found three occupants: Rai-Lynn Dyer, who was in the driver's seat; Cardillo, who was in the front passenger's seat; and Amanda Sisco, who was in a back seat on the driver's side.

Deputy Long asked Dyer, the driver, for her license, but she could not provide him with it because she had neglected to carry it with her that night. When Long asked Dyer her name she replied her name was "Amanda Smith." But Long had personal knowledge of both Amanda Smith and Dyer from prior encounters and knew Dyer was lying about her identity. Because of this knowledge, Long asked Dyer to join him in the front seat of his patrol car, and, once inside, Long told Dyer that he planned to write her a warning for the expired tag and that he needed her name for the paperwork. At this point, Long told Dyer he knew she was not Amanda Smith, and Dyer told Long she had lied about her identity and gave her true name. Long arrested Dyer.

Hunsucker informed Dyer that he planned to have his K-9 sniff the vehicle for illegal drugs. Hunsucker removed Cardillo and Sisco from the vehicle. He placed Cardillo in the front of Wilkinson's patrol car and ordered Sisco to stand in front of Wilkinson's patrol car while he performed the K-9 search of Cardillo's vehicle.

First, Hunsucker allowed his dog to do a "free-air sniff" around the vehicle, and that search did not produce any reaction from the K-9. Next, Hunsucker directed the dog to sniff regions of the car's exterior. When the K-9 sniffed along the bottom of the driver's

side door it sat down, indicating the presence of one of the substances the dog was trained to detect. Upon searching the interior of the car, Hunsucker found a set of digital scales, which were covered in a clear residue he suspected to be methamphetamine, under the driver's seat. While Hunsucker was preforming the K-9 sniff and search of the interior of the vehicle, Sisco was moving around in front of Hunsucker's patrol vehicle, where he had ordered her to stand.

After Hunsucker discovered the scales in the vehicle, officers searched Cardillo and found $285 on him and then placed him in the back of Wilkinson's patrol car. The deputies also placed Sisco in the back of Wilkinson's patrol car, and, in the process, Hunsucker and Wilkinson discovered a bag of methamphetamine on the pavement next to where Hunsucker had instructed Sisco to stand while he searched Cardillo's vehicle. Hunsucker accused Cardillo of dropping the drugs there, but Cardillo denied doing so.

Unbeknownst to Cardillo and Sisco, their conversation inside the patrol car was being recorded by the officers. Sisco and Cardillo discussed the methamphetamine that was found outside the patrol car. During this recorded conversation, Sisco stated that Cardillo had thrown the drugs at her inside Cardillo's vehicle and demanded she take possession of the methamphetamine. Sisco stated that the drugs fell out of her pants and she tried to kick the baggie under the patrol vehicle. During the conversation in the patrol vehicle, Cardillo repeatedly told Sisco that she needed to tell the law enforcement officers that the methamphetamine was hers. At one point in the conversation, Cardillo explicitly threatened to kill her and at other points strongly insinuated the same: "Amanda, I will kill you"; "This is not going to end nice 'cause I'm going to be out eventually"; and "You know what I'm capable of."

When interviewed at the scene, Cardillo admitted to being a methamphetamine dealer. In this interview, he also claimed Sisco was dealing on his behalf. The officers

3

arrested Cardillo and charged him with possession of methamphetamine with intent to distribute and criminal threat.

Following Cardillo's release on bond, he fled to New York City, New York. After law enforcement found his Facebook page, which contained posts that disclosed his location, law enforcement returned Cardillo to Kansas. Because of these actions, the State charged Cardillo with aggravated failure to appear.

Sisco testified at trial that when law enforcement stopped the vehicle, Cardillo tossed the drugs into her lap and told her to get rid of them. Sisco testified that she believed Cardillo would kill her "[b]ecause of his reputation, because of everything I was told." Her belief in this threat was bolstered even more by the fact she witnessed Cardillo beat up the father of her children about a month before this incident. Sisco testified, "I was scared for my children and for me that if I didn't tell them that it was mine, that he would have something done."

Ultimately, the jury found Cardillo guilty of one count each of possession of methamphetamine with intent to distribute, criminal threat, and aggravated failure to appear.

At sentencing, the district court found Cardillo's criminal history score to be a B. Cardillo objected to this classification, and the district court upheld his criminal history score as a B. The district court sentenced Cardillo to a controlling term of 122 months' imprisonment—122 months for possession of methamphetamine with intent to distribute, 6 months concurrent for criminal threat, and 6 months concurrent for aggravated failure to appear.

Cardillo now timely appeals his convictions and sentence.

4

On appeal, Cardillo raises three arguments. First, he argues that his prior criminal threat conviction was improperly used to calculate his criminal history score. Second, he argues his current criminal threat conviction must be reversed because the jury did not reveal if it was convicting him of intentional or reckless criminal threat. Third, he argues the district court erred in denying his motion for new counsel. We will address each argument in turn.

*The State concedes that we must remand this case for sentencing to determine whether Cardillo's prior conviction for criminal threat should have been used to calculate his criminal history score.*

Cardillo's PSI report assigned him a criminal history score of B based in part on a prior 2015 criminal threat conviction, a person felony. Had this conviction not been used to calculate his criminal history score, Cardillo's criminal history score would have been C instead of B. See K.S.A. 2020 Supp. 21-6809. An assigned criminal history score of C would have reduced his controlling sentence by five months—assuming the district court would have also used the mitigated sentence for a criminal history score of C. See K.S.A. 2020 Supp. 21-6805.

A district court is prohibited from using a prior conviction "defined by a statute that has since been determined unconstitutional by an appellate court" to calculate a defendant's criminal history. K.S.A. 2020 Supp. 21-6810(d)(9). In *State v. Boettger*, 310 Kan. 800, 822-23, 450 P.3d 805 (2019), *cert. denied* 140 S. Ct. 1956 (2020), the Kansas Supreme Court held the "reckless disregard" portion of the criminal threat statute found in K.S.A. 2018 Supp. 21-5415(a)(1) to be unconstitutionally overbroad because it encompassed more than true threats and thus potentially punished constitutionally protected speech. But Cardillo's PSI report does not reflect a subsection for his prior

criminal threat conviction. It does not reveal if the jury convicted of reckless or intentional criminal threat under (a)(1) or under a different subsection of the statute. Because it is unclear if Cardillo was previously convicted of a crime that is now considered unconstitutional, we agree with the parties that we must vacate his controlling sentence for the methamphetamine conviction and remand the case so the court can determine whether the prior criminal threat conviction was properly classified as a person felony in accordance with *Boettger*, 310 Kan. at 822, and *State v. Obregon*, 309 Kan. 1267, 1275, 444 P.3d 331 (2019). If the district court finds the criminal history score incorrect, it must resentence Cardillo. If the district court finds the criminal history score correct, we direct it to reimpose Cardillo's original controlling sentence.

*Cardillo's criminal threat conviction must be reversed.*

Second, Cardillo argues that his criminal threat conviction is invalid and must be reversed. He argues his conviction must be reversed because the court instructed the jury on both intentional criminal threat and reckless criminal threat. Our Supreme Court has recently held that the reckless criminal threat statute is unconstitutionally overbroad. See *Boettger*, 310 Kan. at 822. Because of this unconstitutionality, Cardillo implicitly argues the district court committed structural error when the court instructed the jury on both the intentional and reckless forms of the crime. He asserts that when the court instructs a jury on alternative means and one of those means or theories is found to be unconstitutional, the super-sufficiency test cannot be satisfied because the State cannot prove the violation of the constitutional law. Although Cardillo makes several arguments, implicit in all of these arguments is the basic tenant of his argument on appeal that his conviction cannot stand because it is unconstitutional under *Boettger*.

In response, the State argues that precedent says that the submission of both forms of criminal threat to the jury was not structural error but was harmless error. It argues that the threat to kill Sisco was intentional and, as such, any error in instructing the jury on

6

reckless criminal threat was harmless and thus his criminal threat conviction is constitutional.

To prevail in its argument, the State has the burden to establish beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial given the entire record—where there is no reasonable possibility that the error contributed to the verdict. See *State v. Johnson*, 310 Kan. 835, 843, 450 P.3d 790 (2019) (applying *Boettger*), *cert. denied* 140 S. Ct. 1956 (2020) (applying constitutional harmlessness test to jury receiving instructions on both reckless and intentional criminal threat, with reckless criminal threat being since found unconstitutionally overbroad). We are duty-bound to follow Kansas Supreme Court precedent unless there is an indication that the court is departing from its previous precedent *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). With our standard of review in mind, we turn to the merits of Cardillo's argument.

The jury convicted Cardillo of criminal threat in violation of K.S.A. 2015 Supp. 21-5415(a)(1), which reads:

> "(a) A criminal threat is any threat to:
>
> (1) Commit violence communicated with intent to place another in fear, or to cause the evacuation, lock down or disruption in regular, ongoing activities of any building, place of assembly or facility of transportation, or in reckless disregard of the risk of causing such fear or evacuation, lock down or disruption in regular, ongoing activities."

As discussed in the previous issue, the Kansas Supreme Court held in *Boettger*, 310 Kan. at 822-23, the "reckless disregard" portion of the criminal threat statute found in K.S.A. 2018 Supp. 21-5415(a)(1) was unconstitutionally overbroad because it encompassed more than true threats and thus potentially punished constitutionally

protected speech. K.S.A. 2018 Supp. 21-5415(a)(1) prohibited any threat to "[c]ommit violence communicated with intent to place another in fear, or to cause the evacuation, lock down or disruption in regular, ongoing activities of any building, place of assembly or facility of transportation, or *in reckless disregard of the risk* of causing such fear or evacuation, lock down or disruption in regular, ongoing activities." (Emphasis added.) The statutory language of the 2015 version, under which Cardillo was convicted, and the 2018 version, which the Kansas Supreme Court has held to be unconstitutional in part, of the criminal threat statute is the same. Compare K.S.A. 2015 Supp. 21-5415(a)(1) with K.S.A. 2018 Supp. 21-5415(a)(1).

The same day that *Boettger* was filed, the Kansas Supreme Court filed a companion case—*Johnson*, 310 Kan. 835 (applying *Boettger*). In *Boettger*, 310 Kan. at 823, the defendant's conviction turned on the reckless disregard provision of the criminal threat statute. In *Johnson*, 310 Kan. at 843, the State charged the defendant with intentionally *or* recklessly making a criminal threat. The court instructed the jury on both mental states and then provided it a verdict form asking jurors to determine simply if Johnson was guilty of criminal threat. There was nothing to reveal whether the jury found Johnson acted either intentionally or recklessly. This indistinct charging, jury instruction, and verdict form created an alternative means issue because the State alleged both mental states in its complaint. The *Johnson* court employed the constitutional harmless error analysis to determine if the conviction was to be reversed. 310 Kan. at 843.

Ultimately, the Kansas Supreme Court reversed Johnson's conviction and remanded the case for a new trial, holding that the State failed to meet the "'no reasonable possibility'" standard. 310 Kan. at 843. In so holding, it relied on four considerations: (1) "The district court instructed the jury on both forms of criminal threat and accurately recited the [statutory] definitions of 'intentionally' and 'recklessly'"; (2) "neither the jury instructions nor the State's arguments steered the jury toward convicting Johnson based solely on one mental state or the other"; (3) the district judge did not "instruct the jury it

8

had to agree unanimously on whether Johnson acted intentionally or recklessly"; and (4) "the verdict form did not require the jury to make a specific finding." 310 Kan. at 843. The court also noted that based on the evidence, it was reasonable that the jury "could have believed the [defendant's] statements were made with a reckless disregard for whether they caused fear." 310 Kan. at 844.

The Kansas Supreme Court used the considerations weighed in *Johnson* again in *State v. Lindemuth*, 312 Kan. 12, 470 P.3d 1279 (2020). There, "[t]he circumstances contributing to the outcome in *Johnson* also exist[ed] in Lindemuth's case." 312 Kan. at 17. First, the district court instructed the jury on both mental states and provided their statutory definitions. Second, neither the jury instruction nor the State's arguments directed the jury toward a conviction based solely on one mental state or the other. Third, although the district court instructed the jury that its "'agreement upon a verdict must be unanimous,'" the district court did not instruct the jury it must unanimously agree on whether the defendant acted either intentionally or recklessly. 312 Kan. at 18. Fourth, the verdict form did not reflect if the jury had unanimously concluded the defendant made a criminal threat either intentionally or recklessly. Finally, Lindemuth denied making any threatening statements to the victim, and, based on the evidence presented at trial, a reasonable person could have concluded that Lindemuth recklessly disregarded causing fear in his victim, rather than intentionally doing so. As a result, the trial record provided no basis for the court to discern whether the jury concluded the State sufficiently proved intentional criminal threat. Given these considerations, the court held the State did not meet its harmless error burden. As in *Johnson*, the court reversed Lindemuth's conviction and remanded the case to the district court. 312 Kan. at 18-19.

*Johnson* and *Lindemuth* are highly instructive here. So we will weigh each factor urged by the Supreme Court.

9

First, here, the district court instructed the jury on both forms of criminal threat and provided the statutory definitions of "intentionally" and "recklessly." The jury instructions provided, in part:

"To establish this charge, each of the following claims must be proved:

"1. The defendant threatened to:
   "a. commit violence and communicated the threat with the intent to place another in fear; to-wit: Amanda Sisco; or
   "b. commit violence and communicated the threat with reckless disregard of the risk of causing fear in another, to wit: Amanda Sisco."

Second, neither the jury instructions nor the State's arguments steered the jury toward convicting Cardillo based solely on one mental state or the other. During its closing argument the State explicitly argued that it had proven either mental state: "[I]f we prove intentional, then we've already proven knowing and we've already proven reckless. Okay. So your choice is the top, intentional, or the lowest, reckless[,]" and "[t]he State's contention is we've proven intentional. But if you think it's reckless, we've proven that as well, because sitting in the back of a patrol car threatening somebody's life, not only from yourself but from your connect, is pretty serious. That is a reckless disregard that put her in fear."

Third, while the district court did give the jury a unanimity instruction, it did not instruct the jury it had to agree unanimously on whether Cardillo acted intentionally or recklessly. The jury instruction read: "Your agreement upon a verdict must be unanimous."

Fourth, the verdict form did not require the jury to make a specific finding. It simply asked the presiding juror to sign stating either "We, the jury, find the defendant

10

**guilty** of Criminal Threat," or "We, the jury, find the defendant **not guilty** of Criminal Threat."

Finally, based on the evidence, it is reasonable that the jury could have believed Cardillo made his statements with reckless disregard for whether they caused Sisco fear. While Sisco was clearly upset during the long conversation, during the following portion of the dialogue, Cardillo retreated from his threat to kill Sisco at two points:

> "[SISCO]: I'm going to be in trouble regardless. I'm either going to lose my kids or I'm going to lose my life.
> "[CARDILLO]: You're not going to lose nothing."

and

> "[CARDILLO]: I'm going to show you what I do when he gets back in this car.
> "[SISCO]: Kill me?
> "[CARDILLO]: No. No. No.
> "[SISCO]: Say it was all mine and I go to jail.
> "[CARDILLO]: And I'll get you out. That's it."

In *Lindemuth*, the Kansas Supreme Court remarked the jury could have believed that Lindemuth "simply spoke in the heat of argument and the result of unthinking rage— more reckless, impulsive bluster than an intentional threat." 312 Kan. at 18. Likewise, a jury might have viewed Cardillo's statements as such "impulsive bluster," because Cardillo did not reaffirm the threat when Sisco brought it back up and she was in extenuating circumstances with Cardillo—both being detained in the back of the patrol vehicle and his fear of being caught with the methamphetamine. Given the circumstances, the jury *could* have found the statements to be reckless criminal threat, a threat "simply spoke[n] in the heat of argument and the result of unthinking rage," rather than an intentional threat. 312 Kan. at 18; see *State v. Stevenson*, 59 Kan. App. 2d 49, 63-64, 478

11

P.3d 781 (2020) ("talking shit" and "venting" as possible impulsive bluster which undermined the conclusion the jury unanimously found defendant guilty of intentional criminal threat), *petition for review filed* December 21, 2020.

For these reasons, we find the State's argument unpersuasive. The State indiscriminately charged Cardillo; the instructions presented alternative mental states for the crime and did not require unanimity as to which version of criminal threat the jury found Cardillo committed, nor did the verdict form give any indication of which version of criminal threat the jury found him guilty; the State argued both mental states in its closing argument; and there was evidence presented that the jury could have found sufficient to convict Cardillo of criminal threat. As in *Johnson* and *Lindemuth*, the trial record here provides no basis for us to discern whether the jury concluded the State had proved beyond a reasonable doubt that Cardillo committed criminal threat intentionally, and not recklessly. As a result, we cannot conclude the State met its burden to show there is no reasonable possibility the error contributed to the verdict.

We must reverse Cardillo's conviction for criminal threat and remand the case to the district court for further proceedings. Moreover, because this issue is dispositive, we need not address Cardillo's third issue on appeal—the denial of his motion for new counsel.

In sum, we are vacating Cardillo's controlling sentence for his drug charge and remanding the case for resentencing consistent with this opinion. We are reversing Cardillo's conviction for criminal threat and remanding the case for further proceedings. We take no action, nor were we requested to do so, regarding Cardillo's conviction and sentence for aggravated failure to appear.

Reversed in part, vacated in part, and remanded with instructions.

12