NOT DESIGNATED FOR PUBLICATION

No. 122,785

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TRACEY JEROME TOLIVER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; KENDRA S. LEWISON, judge. Opinion filed December 23, 2021. Affirmed in part, vacated in part, and remanded with directions.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*David Lowden*, deputy county district attorney, *Barry R. Wilkerson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., MALONE, J., and JAMES L. BURGESS, S.J.

PER CURIAM: Tracey Jerome Toliver appeals following his convictions of stalking and violating a protection order. Toliver argues that (1) the prosecutor committed prosecutorial error during voir dire; (2) his convictions are multiplicitous; (3) the district court erred in imposing the Board of Indigents' Defense Services (BIDS) attorney fees; (4) his sentence is illegal because his criminal history score included two convictions for criminal threat without stating which version of the offense he committed; and (5) the revised Kansas Sentencing Guidelines Act's (KSGA) use of judicial findings of prior

1

convictions is unconstitutional under section 5 of the Kansas Constitution Bill of Rights. We affirm Toliver's convictions but remand on sentencing issues.

FACTUAL AND PROCEDURAL BACKGROUND

In October 2018, L.P. was working in her front yard when Toliver—who she did not know then—came up to her and said he ran out of gas, so L.P. gave him some gas from her lawn mower. Toliver came back an hour later to return the gas can. For many months, Toliver kept coming back to L.P.'s house. L.P. opened her door the first few times but after that it became "irritating." After a while, L.P. put up motion lights, got different locks, put a peephole on the door, spray painted the window on her door, and bought a doorbell camera because of Toliver.

On June 1, 2019, L.P. called the police when she found a rose on her car and her camera showed Toliver in the area. Riley County Police Officer Paul Terpstra responded to this call. L.P. thought that Toliver's behavior was escalating, so on June 14, 2019, she obtained a protection from stalking order. During this time, Toliver was involved in another unrelated incident where an individual did not want Toliver at their house, and that individual had called the police.

On June 14, 2019, at around 7 p.m., Riley County Police K9 Officer Andrew Toolin personally served the protection from stalking order on Toliver. Toliver asked Toolin if the order related to the incident the prior week involving the other person, and Toolin said he did not know. He directed Toliver to read the papers. The stalking order did not have L.P.'s address but did state her name.

About two hours after being served, Toliver rang L.P.'s doorbell and she called the police. Riley County Police Officer Steven McDiffett responded to L.P.'s call. At the same time, Terpstra found and talked with Toliver, who was still in the area. Toliver told

2

Terpstra he remembered being served with the protection order but stated he thought it was for a different woman, named Ashley, not for L.P. After confirming that Toolin had served Toliver, Terpstra placed Toliver under arrest for violating a protection order.

On June 17, 2019, the State charged Toliver with stalking and violation of a stalking order. The district court held a preliminary hearing and bound Toliver over for a trial on the charges. On December 12, 2019, the district court held a jury trial. L.P, Toolin, McDiffett, and Terpstra testified to the above events.

Toliver testified on his own behalf. Toliver claimed that he read the protection order and did not recognize L.P.'s name. He also claimed that Toolin told him the order probably involved the incident with the other girl. Toliver stated he was not stalking L.P., he was just trying to see if she wanted to hang out and he had no intention of harming her. Toliver said L.P. never told him to stop coming to her house. After hearing the evidence and receiving the instructions, the jury found Toliver guilty of both counts.

The district court ordered a presentence investigation (PSI) report. The PSI reflected that Toliver had a criminal history score of A—based on four person felonies, including two 2014 convictions for criminal threat—making the range for his presumptive sentence for the stalking conviction 17-16-15 months' imprisonment.

On February 24, 2020, the district court sentenced Toliver to a controlling term of 16 months' imprisonment with 12 months' postrelease supervision. The district court ordered Toliver to pay BIDS attorney fees of $2,250. Toliver timely appealed the district court's judgment.

3

Toliver first claims the prosecutor committed prosecutorial error during voir dire by using it as a chance to argue her case and to elicit a pre-judged decision from the jury. The State counters that the prosecutor's voir dire was proper as it probed for bias and prejudice. The State points out that none of the questions touched on the central issue of the case, which was whether Toliver violated a protection order.

A claim of prosecutorial error is reviewable for the first time on appeal. *State v. Haygood*, 308 Kan. 1387, 1397, 430 P.3d 11 (2018). The appellate court's review of a prosecutorial error claim involves a two-step process:  consideration of error and consideration of prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). In considering whether error has occurred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. In examining the prosecutor's statements, the appellate court reads the statements in context rather than in isolation. *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018).

Toliver first challenges the prosecutor's question:  "[W]ho here has ever helped a stranger, by a show of hands?" Several potential jurors raised their hand and the prosecutor asked whether those who responded could "tell us about one of those situations?" A few described helping the elderly with various tasks. One juror then stated that they gave a stranger $5 when the stranger was $5 short at the checkout register. The prosecutor asked, "[W]hat if you saw that person again? How would that make you feel?" The juror responded that they probably would not recognize them, it would not bother them if the person knew where they lived, and it was unlikely that they would be bothered if they kept seeing that person.

The prosecutor then asked the rest of the jurors if they agreed with the previous juror's statement that if "you saw someone you helped again and again, it wouldn't bother you?" Another potential juror responded that she would be suspicious if they continued to come to her house. Another two jurors agreed that it would be suspicious. The prosecutor then addressed a potential juror and asked for his "opinion on someone doing a good thing like that, but then feeling these repercussions?" The juror responded that he would be worried about free hand outs and the person wanting more each time.

Another juror nodded her head and the prosecutor asked if after helping someone there would be a point where she could feel uncomfortable, to which the juror responded if the person kept returning to her house, she would feel uncomfortable. Another juror agreed. Again, the prosecutor asked another two potential jurors about their thoughts "on that type of a situation." The prosecutor asked another juror her thoughts on what the other two said, to which the juror responded that it would depend on if the person came up to her door or was just out in the neighborhood. The prosecutor said that was a good distinction and that part of her job would be to present the circumstances at trial and their job would be to consider it. Another juror agreed that she would want more details because she normally gives people the benefit of the doubt.

The prosecutor turned to another juror and asked their thoughts and they said they also gave everyone the benefit of the doubt, but if it continued they would have a problem with it. Similarly, another juror said he would want more details before he could say whether the person's actions made him uncomfortable. The prosecutor asked whether he would feel fear, but the juror said not "fear, just concern." The prosecutor asked another three potential jurors about their thoughts on the situation, and one stated that it would be different if the person was hanging around an apartment versus a single-family home. The prosecutor then asked another potential juror their thoughts, the juror agreed with the previous juror's statement, and the prosecutor asked for a show of hands on who thought their home was more private than their work.

The prosecutor asked another juror whether he thought there were situations that would require law enforcement's help. The juror said it depended on how long the situation went on for and another juror agreed. The prosecutor asked the remaining two potential jurors their thoughts "about this hypothetical situation?" They both said they agreed with the prior statements about how it would depend on the details, but generally they agreed that there could be a point where it would become suspicious.

Toliver asserts that the prosecutor asked 23 potential jurors their thoughts on the facts of this case and the questions did not go to bias, prejudice, or partiality. Toliver argues that the prosecutor's questioning sought to exact a pledge from the jurors and led them to "prematurely deliberate and form opinions as to important issues in this case . . . ."

The purpose of voir dire is to enable the parties to select jurors who are competent and who could serve without bias, prejudice, or partiality. *State v. Woods*, 301 Kan. 852, 870, 348 P.3d 583 (2015). Toliver is correct in asserting voir dire should not be used to ask jurors specific opinions about the case. Kansas caselaw has recognized that "staking" jurors—the practice of asking case-specific questions designed to commit prospective jurors to a particular view or have them disclose how they would vote—is improper. See *State v. Robinson*, 303 Kan. 11, 136, 140, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017).

While Toliver correctly identifies the limits of voir dire, he incorrectly asserts that the prosecutor's questions constituted case-specific questions and that those questions exacted a pledge from the jurors as to the ultimate issues in the case. The prosecutor did not give any case specific facts during her questioning beyond the general idea that the case may involve someone helping a stranger. The prosecutor then asked each juror what they thought about that type of situation and whether the situation could ever turn into something that made them feel uncomfortable. The questions did not discuss the facts of

6

the case, stalking, or a protection order. Instead, the questions were general and vague. So vague that some of the potential jurors stated that it would depend on the details of the situation, and they could not decide how they would feel about a situation without knowing more facts. But instead of further detailing the situation, the prosecutor acknowledged that the details would be important and reiterated that she would be required during trial to present those details. The prosecutor's questions revealed that the jurors were willing to hear the evidence and decide the case impartially, a proper inquiry for voir dire. Further, her questions were proper to determine whether any juror had a bias or prejudice based on some experience with helping a stranger.

In sum, the prosecutor's questioning of the potential jurors does not rise to the level of case specific questions meant to influence or stake the jury. Nothing in the record suggests that the jurors prematurely deliberated the case or formed opinions on the case. As discussed above, it seems the opposite is true, the jurors conveyed that they could not share how they would feel about any situation without knowing more information. Thus, the prosecutor did not err. Finding no error, we need not address prejudice.

ARE TOLIVER'S CONVICTIONS MULTIPLICITOUS?

Next, Toliver claims, for the first time on appeal, that his convictions are multiplicitous. Toliver asserts that because violation of a protection order is a lesser included crime of stalking, he cannot be convicted of both crimes. The State first asserts that a panel of this court has rejected an identical lesser included offense argument for violating a protection order and stalking. The State then conducts a multiplicity analysis and argues that the two crimes are separate offenses.

Generally, this court does not hear issues raised for the first time on appeal. *State v. Gonzalez*, 311 Kan. 281, 295, 460 P.3d 348 (2020). But Toliver correctly asserts that the Kansas Supreme Court has heard a multiplicity issue for the first time on appeal

7

under the exception for preventing the denial of fundamental rights. 311 Kan. at 295 (applying the second exception on the interests of justice and preventing denial of fundamental rights to address multiplicity issue for first time on appeal). An appellate court applies unlimited review to multiplicity challenges. 311 Kan. at 295.

"The Double Jeopardy Clause prevents a defendant from being punished more than once for the same crime." 311 Kan. at 296. Multiplicity occurs when a single offense is charged as several offenses in a charging document. Multiplicity involves a two-part test: determining first whether the convictions arise from the same conduct, and second whether by statutory definition there is only one offense. Under the first prong, the court determines whether "the conduct is discrete," meaning the convictions do not arise from the same conduct. 311 Kan. at 296. But if the two convictions arise from the same act or transaction then the conduct is unitary, and the court must consider the second prong. Under the second prong, if the convictions are for violating different statutes, the court applies "the same-elements test": determining "'whether each offense contains an element not contained in the other; if not, they are the 'same offen[s]e' and double jeopardy bars additional punishment and successive prosecution.'" 311 Kan. at 296.

Because both Toliver and the State agree that both convictions arose from the same conduct—Toliver's going to L.P.'s house on June 14, 2019, after being served with a protection order—the first prong of the multiplicity analysis is fulfilled. The remaining question is whether, under the same elements test, the crimes are the same offense.

But Toliver does not engage in a same elements test for multiplicity. Toliver's brief merely defines multiplicity, then focuses on whether his two convictions are lesser included offenses of the other under the Kansas lesser included crimes statute. Thus, we could choose to address this issue only as a lesser included offense challenge. See, e.g., *State v. Sinzogan*, 53 Kan. App. 2d 324, 388 P.3d 176 (2017) (finding that although appellant framed issue as a multiplicity issue, he only argued that the two convictions

were prohibited under the lesser included offense statute, so the panel found that any multiplicity challenge was incidentally briefed). That said, both the lesser include offense challenge and the multiplicity challenge require the same analysis.

The lesser included offense statute states that "[u]pon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." K.S.A. 2020 Supp. 21-5109(b). The statute then defines a lesser included crime as "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged." K.S.A. 2020 Supp. 21-5109(b)(2). While the multiplicity analysis does not explicitly refer to lesser included offenses, the same elements test follows the same analysis. Both tests require the elements of the two convictions to be examined to determine whether they each contain an element the other does not.

Toliver was charged and convicted of stalking under K.S.A. 2020 Supp. 21-5427(a)(3) and violation of a protection order under K.S.A. 2020 Supp. 21-5924(a)(6). Under K.S.A. 2020 Supp. 21-5427(a)(3):

> "(a) Stalking is:
> . . . .
> (3) after being served with, or otherwise provided notice of, any protective order included in K.S.A. 21-3843, prior to its repeal or K.S.A. 21-5924, and amendments thereto, that prohibits contact with a targeted person, recklessly engaging in at least one act listed in subsection (f)(1) that violates the provisions of the order and would cause a reasonable person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear . . . ."

Subsection (f)(1) includes, among other actions, "appearing in close proximity to, or entering the targeted person's residence . . . ." K.S.A. 2020 Supp. 21-5427(f)(1)(C). Violation of a protection order is defined as "knowingly violating . . . a protection from stalking . . . order . . . ." K.S.A. 2020 Supp. 21-5924(a)(6).

9

Both the State and Toliver acknowledge that a panel of this court has found that violation of a protection order is not a lesser included offense of stalking. In *Sinzogan*, the appellant, like Toliver, argued that his convictions for violating a protection order and stalking were mutliplicitous under the lesser included offense statute. The panel cited the definitions of the two crimes and pointed out that the statutes required different mental culpabilities. 53 Kan. App. 2d at 327. Violation of a protection order requires the offender act knowingly while stalking requires the offender to act recklessly. 53 Kan. App. 2d at 327; compare K.S.A. 2020 Supp. 21-5924(a)(6) with K.S.A. 2020 Supp. 21-5427(a)(3). The panel concluded that because the mental state for violating a protection order was higher than the mental state for stalking, violation of a protection order was not a lesser included offense of stalking. 53 Kan. App. 2d at 329.

Toliver asserts that the *Sinzogan* panel's analysis is erroneous because it did not consider K.S.A. 2020 Supp. 21-5427(c), part of the stalking statute, which states: "For the purposes of this section, a person served with a protective order . . . shall be presumed to have acted knowingly as to any like future act targeted at the specific person or persons named in the order or as advised by the officer." Toliver argues that because of subsection (c), the culpable mental state for stalking—after the person has been served with a protective order—is knowingly, and thus violation of a protective order is a lesser included offense of stalking.

Toliver is correct that subsection (c) provides a presumption that a person served with a protective order acted knowingly as to future violations. See, e.g., *State v. Chavez*, 310 Kan. 421, 427, 447 P.3d 364 (2019) (stating that the State could prove stalking after the offender was served with a protective order by showing he acted recklessly or that he met the conditions to invoke the presumption in subsection [c]). But Toliver is incorrect in asserting that the presumption in subsection (c) would change the analysis. Both the lesser included offense challenge and the multiplicity challenge focus on the *elements* of the charged crime. See *Gonzalez*, 311 Kan. at 298 ("The same-elements test 'is concerned

solely with the statutory elements of the offenses . . . .'"); K.S.A. 2020 Supp. 21-5109(b)(2) (stating lesser included offense is "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged"). Subsection (c) does not change the mental culpability *element* of the crime. Instead, it merely provides a presumption that the State could use to prove the mental culpability element.

More importantly, the State did not rely on the presumption in subsection (c) to secure Toliver's stalking conviction. The district court instructed the jury that stalking requires reckless conduct and violating a protection order requires knowing conduct. The two crimes as submitted to the jury did not require the same mental culpability.

We find the *Sinzogan* panel's analysis to be persuasive. Toliver's conviction for violating a protection order is not a lesser included offense of his stalking conviction because violation of a protection order requires a higher mental culpability than stalking. As a result, Toliver was properly convicted of both offenses.

DID THE DISTRICT COURT ERR IN ASSESSING BIDS ATTORNEY FEES?

Next, Toliver claims the district court erred in assessing BIDS attorney fees without considering his financial resources. The State concedes that the district court erred in awarding attorney fees without inquiring into Toliver's financial resources.

Toliver correctly asserts that this court can address this issue for the first time on appeal. See *State v. Robinson*, 281 Kan. 538, 541, 132 P.3d 934 (2006) (addressing a BIDS fee challenge for the first time on appeal because the issue involves a question of law on admitted facts and is finally determinative of the case). This court has unlimited review of whether a district court complied with the statutes regarding imposing attorney fees. *State v. Buck-Schrag*, 312 Kan. 540, 555, 477 P.3d 1013 (2020).

11

K.S.A. 22-4513 governs imposing attorney fees:

> "(a) If the defendant is convicted, all expenditures made by the state board of indigents' defense services to provide counsel and other defense services to such defendant or the amount allowed by the board of indigents' defense reimbursement tables as provided in K.S.A. 22-4522, and amendments thereto, whichever is less, shall be taxed against the defendant and shall be enforced as judgments for payment of money in civil cases.
>
> "(b) In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose."

The Kansas Supreme Court has held that under the statute, the district court "'at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision.'" *Buck-Schrag*, 312 Kan. at 555 (quoting *Robinson*, 281 Kan. at 546). As both parties assert, the district court did not consider Toliver's financial resources before assessing the BIDS fee. In fact, the district court engaged in no analysis on the record when assessed the fee, merely stating, "There is a BIDS fee of $2,250 . . . ." The proper remedy is for this court to vacate the assessment of the BIDS attorney fees and remand for the district court to comply with K.S.A. 22-4513. *State v. Smyser*, 297 Kan. 199, 207, 299 P.3d 309 (2013).

## DID THE DISTRICT COURT IMPOSE AN ILLEGAL SENTENCE?

Next, Toliver claims his sentence is illegal because his criminal history score included prior convictions of criminal threat without clarifying which version of the offense he committed. Under the KSGA, a defendant's sentence depends on the crime of conviction and the defendant's criminal history score. K.S.A. 2020 Supp. 21-6804(d). "Prior convictions of a crime defined by a statute that has since been determined

unconstitutional by an appellate court shall not be used for criminal history scoring purposes." K.S.A. 2020 Supp. 21-6810(d)(9). In October 2019, the Kansas Supreme Court held "the portion of K.S.A. 2018 Supp. 21-5415(a)(1) allowing for a conviction if a threat of violence is made in reckless disregard for causing fear causes the statute to be unconstitutionally overbroad because it can apply to statements made without the intent to cause fear of violence." *State v. Boettger*, 310 Kan. 800, 822, 450 P.3d 805 (2019), *cert. denied*, 140 S. Ct. 1956 (2020).

Toliver correctly asserts that he can challenge his criminal history score for the first time on appeal. See *State v. Dickey*, 305 Kan. 217, 220, 380 P.3d 230 (2016) (stating the misclassification of a prior conviction creates an illegal sentence that can be corrected at any time). Classification of prior convictions for criminal history purposes involves statutory interpretation of the KSGA. Statutory interpretation is a question of law subject to unlimited review. *State v. Wetrich*, 307 Kan. 552, 555, 412 P.3d 984 (2018).

The PSI here reflected that Toliver had a criminal history score of A—based on four person felonies, including two 2014 convictions for criminal threat—making his presumptive sentence 17-16-15 months' imprisonment. See K.S.A. 2020 Supp. 21-6804(a). The PSI does not reveal whether Toliver was convicted of the unconstitutional reckless version of the offense or the intentional version of the offense. If he was convicted of the reckless version of the offense on both convictions, then his criminal history score would be B, lowering his presumptive sentence range to 15-14-13 months' imprisonment. See K.S.A. 2020 Supp. 21-6804(a).

It is the State's burden to prove a defendant's criminal history. *State v. Obregon*, 309 Kan. 1267, 1275, 444 P.3d 331 (2019). Because the PSI does not provide the answer of which version of the offense Toliver committed, this court would generally remand the matter for resentencing, directing the district court to apply the "'modified categorical approach'"—which allows the examination of "'charging documents, plea agreements,

13

transcripts of plea colloquies, findings of fact and conclusions of law from a bench trial, and jury instructions and verdict forms'"—to determine which statutory alternative was the basis for conviction. 309 Kan. at 1274 (discussing the modified categorical approach in relation to alternative means out-of-state crimes).

The State concedes that under *Boettger* and *Obregon*, remand generally would be necessary here because the PSI does not reflect which version of the offense Toliver committed. But the State argues that this claim is moot because Toliver has served his sentence and thus imposition of a shorter sentence would not affect him.

Generally, Kansas appellate courts do not decide moot questions or render advisory opinions. *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012). The mootness doctrine is one of court policy, under which the court is to "'determine real controversies relative to the legal rights of persons and properties which are actually involved in the particular case properly brought before it and to adjudicate those rights in such manner that the determination will be operative, final, and conclusive.'" 295 Kan. at 840. An issue is moot if "'it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.'" 295 Kan. at 840-41.

The party asserting mootness bears the initial burden of showing that a case is moot. *State v. Roat*, 311 Kan. 581, 593, 466 P.3d 439 (2020). To support its claim that this issue is moot, the State points to the sentence imposed by the district court. The district court imposed 16 months' imprisonment to begin on February 18, 2020. And the journal entry showed no prior cases for which the sentence was to run consecutive. Based on the sentence imposed by the district court, perhaps Toliver has served his sentence and is on postrelease supervision—assuming the journal entry is correct.

But when a party alleges a change in circumstances since the district court proceedings has rendered the action moot, an appellate court must confirm the change in circumstances before it can consider mootness. And an appellate court must scrutinize the reliability of evidence before considering it a basis for appellate fact-finding. *State v. Castle*, 59 Kan. App. 2d 39, 46, 477 P.3d 266 (2020). In *Castle*, this court held the State met its initial burden of showing a sentencing appeal was moot by filing a notice of change in custodial status under Kansas Supreme Court Rule 2.042 (2020 Kan. S. Ct. R. 18) stating the defendant had been released from prison with an attached "Certification of Time Served" from the Kansas Department of Corrections. 59 Kan. App. 2d at 42.

The State ignored Supreme Court Rule 2.042 and has offered no direct evidence that Toliver has served his sentence, although following the approved procedure would have been an easy step for the State to complete. As a result, we find the State has failed to meet its initial burden of showing that Toliver's sentencing issue is moot. Thus, we must address the merits of Toliver's illegal sentence claim, and we agree the claim has merit because of a possible error in his criminal history.

We need not vacate Toliver's sentence (except the BIDS attorney fees order that we have already vacated) because his current sentence may be legal. But we remand this matter to the district court to determine whether Toliver's prior convictions of criminal threat stemmed from the intentional or reckless version of the statute. Unless the State can show that at least one of Toliver's prior criminal threat convictions stemmed from intentional conduct, keeping Toliver's criminal history score of A, then the district court must vacate Toliver's sentence and resentence him using the correct criminal history score. On remand, the State is not precluded from arguing to the district court that resentencing is moot and providing proof for its assertion.

## DOES TOLIVER'S SENTENCE VIOLATE THE KANSAS CONSTITUTION?

Finally, Toliver claims for the first time on appeal that the KSGA's use of judicial findings of prior convictions for criminal history purposes is unconstitutional under section 5 of the Kansas Constitution. But Toliver raises the same argument recently rejected by the Kansas Supreme Court in *State v. Albano*, 313 Kan. 638, 487 P.3d 750 (2021). In *Albano*, our Supreme Court held that "the KSGA provisions authorizing the court to make criminal history findings for purposes of imposing a sentence do not violate section 5 because such judicial findings do not impair the traditional functions of the jury in Kansas criminal proceedings." 313 Kan. at 657. The Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication our Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We have no indication that our Supreme Court is departing from its recent unanimous decision in *Albano*.

Affirmed in part, vacated in part, and remanded with directions.